# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39859**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Liam C. LATTIN**
First Lieutenant (O-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 20 April 2022

————————————

*Military Judge*: Bryan D. Watson.

*Sentence*: Sentence adjudged 12 December 2019 by GCM convened at Luke Air Force Base, Arizona. Sentence entered by military judge on 28 January 2020: Dismissal, confinement for 10 years, and forfeiture of all pay and allowances.

*For Appellant:* Major Alexander A. Navarro, USAF; Bethany L. Payton-O'Brien, Esquire.

*For Appellee*: Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel Dayle P. Percle, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH joined. Judge CADOTTE filed a separate opinion, dissenting in part and in the result.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Judge:

A general court-martial comprised of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault of KA in violation of Article 120, UCMJ, 10 U.S.C. § 920, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), and one specification each of sexual assault and abusive sexual contact of AW in violation of Article 120, UCMJ.[1,2] Consistent with his pleas, Appellant was found not guilty of two other specifications charged in violation of Article 120, UCMJ.[3] The court-martial sentenced Appellant to a dismissal, ten years in confinement, and forfeiture of all pay and allowances. The convening authority did not disturb the sentence adjudged.

Appellant, through counsel, raises eight assignments of error, which we have reordered: (1) whether his convictions were factually and legally sufficient; (2) whether the search of his cell phone violated both the terms of the authorization and his Fourth Amendment[4] right to particularity; (3) whether the military judge's omission of the specific intent pled in Specification 5 (abusive sexual contact of AW) from the instructions violated his due process rights; (4) whether the Government violated his due process rights when it charged him with sexual assault by bodily harm and then tried and convicted him of sexual assault upon a person incapable of consenting; (5) whether the military judge's admission of testimony relating to AW's character amounted to plain error; (6) whether the military judge's admission of "human lie detector" evidence created plain error; (7) whether the trial counsel's argument vouching for a witness and encouraging members to compare the charged offenses was improper; and (8) whether the trial defense counsel's failure to object to incomplete instructions, improper character evidence, human lie detector testimony, and improper argument (issues (3), (5), (6), and (7)) amount to ineffective assistance of counsel.

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Before arraignment, the Government withdrew and dismissed three other specifications charged in violation of Article 120, UCMJ.

[3] The military judge instructed the members that the two specifications involving KA were "alleged in the alternative," and therefore they could not find Appellant guilty of both. Appellant was convicted of sexual assault of KA by penile penetration, and acquitted of sexual assault by digital penetration. Additionally, Appellant was acquitted of sexual assault of AW by penile penetration.

[4] U.S. CONST. amend. IV.

Appellant personally raises three additional issues on appeal:[5] (9) whether his sentence to confinement for ten years is inappropriately severe; (10) whether the military judge erred in giving a false exculpatory statement instruction for a general denial of guilt; and (11) whether trial defense counsel were ineffective for not filing a post-trial motion after the convening authority neglected to take action in the case. In addition, the court considers the issue of timely appellate review. We have carefully considered issues (4), (9), and (10) and determine no discussion or relief is warranted. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

## I. BACKGROUND

Appellant was a fighter pilot, assigned to Luke Air Force Base (AFB), Arizona. He lived in nearby Glendale, Arizona, in an apartment close to an entertainment district during the charged time frames.

### A. KA

Appellant and KA met in the fall of 2016 while they were enrolled in undergraduate pilot training (UPT). Afterwards, they kept in touch sporadically. Appellant contacted KA in August 2018 and invited her to a party he would be attending with other UPT classmates near her duty station in Albuquerque, New Mexico. At the party, KA and Appellant flirted and engaged in some sexual behavior. Appellant invited KA to visit him, and over the next several weeks they made arrangements for that visit. They communicated frequently via text on their phones.

KA flew into Arizona on the evening of Friday, 7 September 2018, and planned to return on Sunday. The evening she arrived, KA stayed with Appellant at his apartment. KA and Appellant were kissing on his couch, and Appellant tried to unbutton KA's pants. KA said no, and Appellant stopped and asked why. KA said she "didn't want to," and Appellant went upstairs and KA slept on the couch. The next morning, Appellant was "more short with his response to anything that [KA] was saying, and more physically distan[t]." This behavior continued during the rest of her visit.

On Saturday, KA and Appellant, along with several coworkers and friends of Appellant, went on a five-hour "river float." KS[6] was one of those friends. He took notice of KA and told Appellant he was interested in her, but was nervous to talk to her. Appellant responded with encouragement. KS spent about half of the time on the river float getting to know KA. Alcoholic beverages were

---

[5] *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[6] KS was Appellant's peer and fellow officer.

abundant on the float. KA became intoxicated and her behavior became more outgoing. During the river float, she and KS talked and kissed. After the river float, on the bus to the parking lot, KS kissed KA "because she was very insistent," "really forcing herself on me, asking me to kiss her, make out with her." On the ride from the parking lot back to Glendale, KS and KA again were sitting together, "cuddled." KS was dropped off at his home first; Appellant and KA went to Appellant's apartment. KS arranged with Appellant to come to his apartment later that day and ask KA on a date.

KA testified that she got "super drunk" during the river float and it caused gaps in her memory of the rest of that day. She remembered kissing Appellant once, but that he avoided her during the river float. She remembered talking to KS during the river float, and then on the ride back entering her phone number in KS's phone. Her next memory is in Appellant's apartment, "being leaned over an ottoman and facing the kitchen . . . and I felt that there was penetration or attempted penetration [of her vagina] from behind." Then Appellant told her to put her clothes on because KS was coming over.

KS did come over to Appellant's apartment. With Appellant's encouragement, KS convinced KA to go to dinner with him. Without her knowledge, KA's suitcase was placed in KS's vehicle and Appellant left his apartment. KS and KA went to dinner, then back to his apartment, where they engaged in sexual activity. KS drove KA to the airport the next day. KA remembered very little of her interactions with KS the day of the river float.

Within five days of returning to Albuquerque, KA filed a restricted report of sexual assault. She named KS and Appellant as perpetrators. KA told Appellant in one of their text conversations, "Blackout aka not consent. I accept your apology. Going forward in the future I hope you don't let this happen to anyone else. Because there's always the potential to unrestrict my report with the SARC." Appellant's conduct in penetrating KA's vulva with his penis was the basis for his conviction for sexual assault of KA in violation of Article 120, UCMJ.

**B. AW**

AW was an Air Force Reserve Officer Training Corps (ROTC) cadet at the University of Southern California (USC), in Los Angeles, California. Her ROTC detachment took a three-day trip to Luke AFB in late January 2019. The purpose of the trip was to expose the cadets to different career paths. They arrived by bus on a Wednesday, stayed in a hotel near Luke AFB, and departed for California on Saturday.

On that Friday, 25 January 2019, as they toured a fighter squadron building, AW saw photos of squadron members on the wall and recognized Appellant's name. AW's boyfriend, TD, was in Appellant's ROTC class at USC. TD ultimately did not commission in the Air Force; he became a police officer.

The ROTC group ended the day at the fighter squadron bar for a "meet and greet." The pilots offered the cadets a shot of whiskey, which they eventually accepted although their ROTC commander (CC) had specified no drinking was allowed on the trip. AW approached and talked to Appellant, who remembered TD.

That evening, Appellant contacted AW through Facebook, asking if she wanted to meet up; she agreed. AW invited Cadet AP, who was in ROTC with Appellant. Cadet AP decided not to join them because he wanted to bring another cadet along, and AW did not want to "shop talk." AW felt safe to go out with Appellant alone because he knew she had a boyfriend, even though she suspected—based on his messages—he might have "romantic inclinations."

Appellant picked up AW from her hotel, and took her to his apartment. She drank one beer at his apartment before they walked to a nearby bar, where she drank a "whiskey ginger." They walked to a second bar, and outside that bar Appellant "grabs [AW's] waist, pulls [her] in, and tries to kiss" AW. She told him no, and that she didn't want to cheat on her boyfriend. Appellant said, "[O]kay, that's fine we won't do it." AW testified that while at a third bar, she told Appellant, "[H]ad I not have recently just gotten back together with my boyfriend I might be more interested in trying to pursue a romantic relationship with him. And I did tell him that I liked him and had a crush on him," and AW recalled Appellant's response being "respectful of [her] not wanting to cheat." Cadet AP and another cadet joined them at the third bar briefly. AW did not leave the bar with the other cadets because she was enjoying talking to Appellant, and Appellant "was fine" to drive her to her hotel.

After Appellant and AW left the third bar, they walked to Appellant's apartment. Appellant "poured another drink and [said] he was unable to drive, but he turned on a movie." AW was sitting on a chair, but moved to the same couch Appellant was on in order to see the television better. Appellant motioned for AW to lay down, but she did not want to. Appellant lay down, put his legs on her lap, and then again motioned for her to lay down. Appellant tickled AW, which resulted in her laying into a "spooning" position, with Appellant behind her, and holding her in a "bear hug." Appellant turned AW on her back and began "forcefully kissing" her. AW protested, but Appellant continued. AW closed her "lips really tight," then was able to roll off the couch onto the floor. Appellant tickled AW in a more aggressive manner, causing her pain. To get him to stop tickling her, AW moved back to the couch, with Appellant "also kind of pulling" her. Appellant again tried to kiss AW, and she again

pursed her lips. AW then described the conduct underlying the two convictions under review:

> At first—I think he's continuing to tickle me because I remember at some point trying to pull his fingers off. After trying to kiss me—at this point in time I'm wearing a quarter zip sweatshirt, so he pulls the sweatshirt and my bra aside and begins biting my nipple. And I say "ouch that hurts" [and] he stops. He goes back to kissing me, and then while he's kissing me, he begins pulling my pants down to begin penetrating me with his finger.

Appellant displayed no reaction to AW saying it hurt. AW tensed her muscles, like "into a really stiff plank," and then Appellant stopped penetrating her vagina. Appellant asked her what was wrong, and AW said she had "been in a situation like this before and [she] just didn't want to do this now." Appellant resumed his spooning position and told AW "everything's fine," that she is "safe," and "everything's going to be okay" while he was petting her hair. After a few minutes, Appellant resumed trying to kiss AW. AW was scared and wanted to leave, but she could not get Appellant off her and could not reach her phone. AW testified that Appellant then maneuvered AW onto his lap. AW made herself hyperventilate so Appellant would think she was having a panic attack. Appellant once again laid with AW in the spooning position. He again told her "it's fine" and "everything's safe," while petting her hair. He tried to kiss her again, and said, "come to Hill with me, be my dependent." Out of fear,[7] AW kissed him back. Eventually she starting falling asleep, and Appellant decided they should go to sleep.

AW "repositioned" her clothes and went to the upstairs bedroom—getting her phone on the way—and Appellant stayed on the couch. Once in the bedroom, AW began a text conversation with her boyfriend TD. They had texted earlier in the evening, and TD knew AW was going out with Appellant. AW's texts included, "Baby I need help," "I'm scared," and "Don't text back pls." TD messaged AW, "[Y]ou passed out at [Appellant's], he put you in his bed, and he's sleeping downstairs. You're fine, nothing happened." AW then learned that TD texted Appellant, and that is what Appellant had told TD. Before TD texted Appellant—and twice after—AW told TD not to tell anyone; she was concerned she would get in trouble for having had alcohol on the trip and "the CC will disenroll [her] for it." She told TD about the assaults. AW was emphatic

---

[7] AW testified why she was scared: "This violent thing had just happened and now he—he's—it seems almost delusional because I've said no and I've tried to push him off, and now he seems to be under the impression that I want to continue this relationship and follow him to his next base."

that TD not do anything to cause the local police to be called out to Appellant's apartment.

AW fell asleep, and woke when she heard Glendale police officers arrive. AW spoke to the officers and denied anything was wrong. During trial, AW explained that she "was evasive of their questions and uncooperative so that they would leave." To avoid prompting Appellant to more violence, she thought her "best plan of action was just to play it cool, act like nothing happened. [She] was fairly certain that he would drive [her] back to the hotel because if [she] didn't get back to the hotel and miss the bus, questions would be asked." After the police left, one of the cadets messaged AW. He told her that security forces personnel were looking for her, and they contacted a senior cadre member, Capt ST. Shortly thereafter, around 0600, Appellant drove AW to her hotel. When AW arrived at the hotel, Capt ST was waiting for her in the lobby. AW did not provide Capt ST details, saying that "things had gotten really out of hand . . . really quickly."

After returning to California on 26 January 2019, AW reported what happened to personnel at the University of California at Los Angeles (UCLA) Santa Monica Rape Treatment Center. There, AW underwent a sexual assault forensic examination (SAFE) and an interview with law enforcement. The SAFE "kit," comprising a report and the collected evidence, as well as AW's statement, was provided to agents of the Air Force Office of Special Investigations (AFOSI), who interviewed AW on 1 February 2019. Forensic analysis of the collected evidence indicated Appellant's DNA was on AW's left nipple, inside her bra, and on the inside front panel of her leggings. Appellant's conduct in penetrating AW's vulva with his finger and touching her nipple with his mouth was the basis for his convictions for sexual assault and abusive sexual contact, respectively, of AW in violation of Article 120, UCMJ.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[I]n resolving questions of legal

sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). The evidence can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing Rule for Courts-Martial (R.C.M.) 918 (c)) (additional citation omitted). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element of an offense was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). "The term reasonable doubt . . . does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "Court members may believe one portion of a witness's testimony but disbelieve others." *United States v. Bare*, 63 M.J. 707, 713 (A.F. Ct. Crim. App. 2006) (citing *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979)). "[T]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

**2. Sexual Assault of KA**

Appellant urges this court to find his convictions for offenses against KA legally and factually insufficient. He claims the evidence (1) does not prove actual penetration, (2) does not prove KA did not consent, and (3) does not disprove Appellant had an honest and reasonable mistake of fact as to consent and capacity to consent.[8]

---

[8] Appellant also asks us to find KA's account not credible "[d]ue to [KA's] numerous inconsistencies, motives for fabrication, and the contradictory evidence in the record;" however, Appellant does not highlight any such testimony or evidence. While we do not directly address this claim, we considered all the testimony and evidence presented at the court-martial before making our determinations of legal and factual sufficiency.

### *a. Additional Law*

As charged, the elements of Specification 1 of the Charge alleging sexual assault by bodily harm in violation of Article 120, UCMJ, of which Appellant was convicted, include: (1) that Appellant committed a sexual act upon KA by causing penetration, however slight, of her vulva with his penis; (2) that Appellant did so by causing bodily harm to KA; and (3) that Appellant did so without the consent of KA. *See* 2016 *MCM*, pt. IV, ¶ 45.b.(3)(b). The term "vulva" describes the female external genitalia, including the labia majora and labia minora. *See Approved Change 18-14* (23 Jan. 2019), *modifying Military Judges' Benchbook*, Dept. of the Army Pamphlet 27–9 (10 Sep. 2014) (citing *United States v. Williams*, 25 M.J. 854, 855 (A.F.C.M.R. 1988)). "Bodily harm" includes "any nonconsensual sexual act or nonconsensual sexual contact." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(3). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(A). An "incompetent person cannot consent." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(B). "Lack of consent may be inferred based on the circumstances of the offense." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

The affirmative defense of mistake of fact as to consent requires that an accused, because of ignorance or mistake, incorrectly believe that another consented to the sexual contact. *See* R.C.M. 916(j)(1). In order to rely on this defense, the accused's belief must be honest and reasonable. *See id.*; *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). The "burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *McDonald*, 78 M.J. at 381. An "[a]ppellant's actions could only be considered innocent if he had formed a reasonable belief that he had obtained consent. The Government only need[s] to prove that he had not done so to eliminate the mistake of fact defense." *Id*. "Just because the actions of the other person may tend[ ] to show objective circumstances upon which a reasonable person might rely to infer consent, to satisfy the honest prong they must provide insight as to whether [the] appellant actually or subjectively did infer consent based on these circumstances." *United States v. Rodela*, 82 M.J. 521, 528–29 (A.F. Ct. Crim. App. 2021) (alterations in original) (internal quotation marks omitted) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995)), *rev. denied*, No. 22-0111, 2022 CAAF LEXIS 278 (C.A.A.F. 12 Apr. 2022).

### b. Additional Background and Analysis

#### i) Penetration

The evidence supporting penile penetration of the vulva consists of KA's testimony and Appellant's statements to others, mostly in the form of text messages. KA testified about the penetration during the assault:

> A [KA]: I remember being leaned over an ottoman and facing the kitchen. I remember that it was still daylight out, but my vision was blurry and I felt that there was penetration or attempted penetration from behind.
>
> Q [Trial Counsel]: What made you feel like that?
>
> A: You could just feel it happening.
>
> Q: What did you feel?
>
> A: Pressure from behind.
>
> Q: And where on your body did you feel that pressure?
>
> A: My vagina.
>
> Q: Do you remember anything else from that memory?
>
> A: So, I'm not sure how long it lasted, but I do remember either my vision going black, or I had my eyes closed, and I heard him say, "put your clothes on, [KS is] coming over" and I just remember thinking why would he be coming over?

In conversations with several people, Appellant stated or implied he had sex with KA. In a text conversation with one of his friends and fellow officers, DS, Appellant declared, "And funny thing," "I was inside her earlier" followed by several emoji (three faces with tears of joy, winking face with tongue, and okay hand), then "So [KS] and I might be Eskimo bros in [t]he future. Without him knowing," followed by a shushing-face emoji. DS testified that he presumed "Eskimo brothers" to mean that "both either had or would have had at some point in the future, intercourse with the same individual." DS also testified that he believed Appellant had verbally told him he had had sex with KA. Appellant's father testified that Appellant told him he had a "brief sexual encounter . . . with [KA]" not long before KS had sex with her. In Appellant's text messages to another friend and fellow officer, AS, he said, "Got [KS] bone laid" followed by three grinning face emoji. AS responded, "Ha [KS] found a lucky lady?" to which Appellant responded, "No he found me who led him down the beaten path" followed by three grinning face emoji. AS responded, "Classic rejoin move," which, as AS testified, in relation to flying jets means to "maneuver the aircraft to get back together." None of these conversations regarding sexual

activity with KA suggest that he used his finger and not his penis when he had sex with KA.

While Appellant boasted to others about having sex with KA before KS had sex with her, Appellant denied to KA that they had engaged in any sexual activity that evening. In a text conversation following KA's return home, KA confronted Appellant about his treatment of her, focusing on Appellant "send[ing] her] off with [his] friend" while she was "extremely drunk and incoherent." At one point, KA told Appellant, "I'm pretty sure you and I did something back at your place after the river but again I can only remember short clips." Appellant's reply begins, "Woah [KA], first of all we didn't 'do anything' and second I'm sorry you feel that way." Later, after KA said she filed a restricted report of sexual assault, Appellant stated, "Even the fact that you're putting me in there when i did nothing to you pisses me off."[9]

### ii) Without Consent

As charged, the Government was required to prove beyond a reasonable doubt, that Appellant penetrated KA "without her consent," as well as that the act was done by causing bodily harm, that is, an "offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(3). KA testified that, while she was visiting Appellant in Arizona, the only sexual act with him to which she consented was "making out." The record contains no evidence that KA consented to Appellant penetrating her vulva with his penis. In response to a question from a court member, KA testified that she did not ever tell Appellant she wanted to have sex with him.

Appellant highlights that KA testified that she did not remember the events leading up to the assault, to include whether she told Appellant she consented to that sexual act. In short, Appellant argues that the Government could not prove KA did not consent because she could not remember her actions before Appellant penetrated her. Lack of consent can be inferred; it need not be proven with direct evidence. *See* 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(C). KA's testimony under oath that she did not consent, along with Appellant's cold interactions with her before and after the act, Appellant's messages to her denying they did "anything," and Appellant's messages to others implying that he

---

[9] Appellant also denied to KA that he "kicked" her out, telling her "you left on your own accord," "you made the decision to leave," and "i wasn't trying to be a douchebag from what you probably think. I figured you two liked each other and were doing your thing." Appellant's texts to KS while KA was at Appellant's apartment clearly demonstrate Appellant was urging KS to get KA to leave with him, telling him to "get her suitcase too," "[t]ell her to just go with you," "take her," and "[g]et her the f[**]k out of my place please."

had sexual intercourse with KA, is enough for a reasonable factfinder to determine Appellant penetrated KA's vulva with his penis and without her consent.

### *iii) Mistake of Fact as to Consent*

At trial, Appellant successfully moved to admit evidence under Mil. R. Evid. 412 that KA and Appellant engaged in sexual acts three weeks before the assault, and that KA was trying to cultivate a romantic relationship with Appellant. The military judge ruled that "if KA and [Appellant] engaged in consensual sexual activities on 11 Aug[ust 20]18, the existence of consent or mistake of fact as to consent on or about 8 Sep[tember 20]18 may be more likely." The military judge continued:

> If KA wanted to engage in sexual activity with [Appellant] on 11 Aug[ust 20]18, . . . such may be highly probative to the trier of fact on both the question of consent and the question of mistake of fact as to consent in the instant case. This is particularly true if KA was attempting to cultivate a long-term relationship with [Appellant], and especially if she had taken specific actions in order to pursue a romantic and physical relationship with [Appellant].

In his draft instructions he provided to the parties, the military judge included instructions on consent and on mistake of fact as to consent for all specifications. The parties did not comment on these instructions on the record. The military judge then provided the members these instructions before they began their deliberations.

A viable defense based on mistake of fact as to consent is not supported by the record. Appellant does not highlight any evidence, and we find none, to indicate Appellant believed KA consented to him penetrating her vulva with his penis.[10] Instead, Appellant highlights circumstances indicating KA appeared to have the ability to consent. Such circumstances would be some evidence regarding whether a mistaken belief is reasonable.[11] However, for the defense of mistake of fact, whether a belief would be reasonable is inconsequential if no such belief existed. Finally, evidence that KA did not appear too impaired to consent does not support an inference that Appellant believed he had first obtained consent to engage in the charged conduct.

---

[10] We decline to infer that Appellant boasting about his encounter is circumstantial evidence of his belief that KA consented to the sexual act.

[11] And, on the issue of actual consent, it would be some evidence of whether the other person had the capacity to consent.

While we see the possibility that the Mil. R. Evid. 412 evidence could be probative on the issues of consent and mistake of fact as to consent, we are not persuaded this evidence—along with the other relevant evidence introduced at trial—establishes that Appellant had an honest but mistaken belief that KA consented to him penetrating her vulva. Therefore, we find no merit to Appellant's claim that the Government failed to disprove mistake of fact beyond a reasonable doubt.

**3. Sexual Assault and Abusive Sexual Contact of AW**

Appellant urges this court to find his convictions for offenses against AW legally and factually insufficient. He claims AW was not credible, specifically due to "numerous inconsistencies, motives for fabrication, her destruction of evidence,[12] and the contradictory evidence in the record."

### *a. Additional Law*

As charged, the elements of Specification 4 of the Charge alleging sexual assault without consent in violation of Article 120, UCMJ, of which Appellant was convicted include: (1) that Appellant committed a sexual act upon AW, specifically by penetrating her vulva with his finger; (2) the penetration was done with an intent to gratify Appellant's sexual desires; and (3) that Appellant did so without the consent of AW. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d). "Sexual act" includes penetration of the vulva of another by any part of the body with an intent to gratify the sexual desire of any person. *See MCM*, pt. IV, ¶ 60.a.(g)(1)(C). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). An "incompetent person cannot consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(B).

As charged, the elements of Specification 5 of the Charge alleging abusive sexual contact without consent in violation of Article 120, UCMJ, of which Appellant was convicted include: (1) that Appellant committed sexual contact upon AW, specifically by touching her nipple with his mouth; (2) the touching was done with an intent to gratify Appellant's sexual desires; and (3) that Appellant did so without the consent of AW. *See MCM*, pt. IV, ¶ 60.b.(4)(d). "Sexual contact" includes touching the breast of another person with an intent to gratify the sexual desire of any person. *See MCM*, pt. IV, ¶ 60.a.(g)(2). Consent in this context is the same as described above in relation to Specification 4. The

---

[12] Appellant claims simply, "both [AW and TD] deleted evidence (text messages and photographs)." The record indicates AW and TD retrieved messages from the time of the incident that AW had deleted from her phone but were saved in a cloud account, and provided those to investigators. The record is unclear whether AW recovered deleted photos of her injuries taken after the SAFE.

law relating to the affirmative defense of mistake of fact as to consent relevant to Specifications 4 and 5 is the same as discussed above in connection with Specification 1.

### b. Additional Background and Analysis

#### i) Motive to Misrepresent

Appellant claims AW made baseless sexual assault allegations against Appellant to "deflect[ ] attention" from her unauthorized use of alcohol and to "hide her consensual sexual behavior in which she cheated on" her boyfriend. We find these claims unpersuasive. The record indicates AW's commander was not aware that cadets had been drinking alcohol until after AW made her report of sexual assault. Similarly, AW's boyfriend was not aware Appellant engaged in sexual activity with AW or that AW was "scared" while at Appellant's apartment until AW told him. The spotlight was not on AW such that she needed to "deflect" or "hide," nor did she anticipate it would be.

#### ii) Misrepresentation and Credibility

Appellant claims AW "gave numerous inconsistent stories" about how the assault occurred and that she deleted text messages and photographs. We have considered these claims with our review of the record, and find them unconvincing.

We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's convicted offenses. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## B. Motion to Suppress Evidence from Appellant's Cell Phone

Before trial, the Defense moved to suppress text messages found as a result of searching Appellant's cell phone. The military judge denied the motion, and the Government introduced several exhibits containing messages between Appellant and others, to include AW, TD, KA, KS, Appellant's father, and DS.

Appellant asserts the military judge erred by denying his motion to suppress evidence obtained from a search of his cell phone because the search violated the terms of the authorization, and the search authorization violated his Fourth Amendment right to particularity. Appellant challenges all messages gathered from his phone, as well as messages gathered from other sources that relate to KA. We consider Appellant's specific assertions that (1) the search continued past the date the authorization expired, (2) the scope of the search was overbroad, (3) the inevitable-discovery doctrine does not apply, (4) the good-faith doctrine does not apply, and (5) the exclusionary rule should apply

as a deterrent measure. We decide issues (1), part of (3), and (5) against Appellant.

**1. Additional Background**

AFOSI Special Agent (SA) LB prepared an Air Force Form 1176 (AF 1176),[13] along with an affidavit. On 13 February 2019, she presented these documents to Appellant's group commander ("search authority") who had authority to grant a search authorization with respect to Appellant. Also present at this meeting was a judge advocate.

The affidavit accompanying the AF 1176 referenced AW's report to the UCLA police department, which noted AW's text messages with her boyfriend TD about the incident as well as text messages between TD and Appellant. The affidavit did not mention communications between AW and Appellant.

SA LB testified at the hearing on the defense motion to suppress. She explained that before she sought search authorization, she understood that AW told the "Los Angeles agent" that "there were text messages between her and [Appellant], her and [TD]." She wanted the authority to search Appellant's phone for "communications between [Appellant] and [AW] and between [Appellant] and TD. . . . and ensure that [the messages] were actually from [Appellant's] phone." She believed she orally told the search authority that there were messages between AW and Appellant. SA LB agreed on cross-examination that "there was no other information as far as what other . . . information existed in this world that would indicate anything outside of that" would be found on Appellant's phone, adding, "I guess no other – nothing else to lead me to believe there would be anything on the phone other than those [text messages]."

The search authority signed the AF 1176, stating he authorized a search of Appellant's person and property, specifically Appellant's DNA and his "mobile device with biometric access." This search authorization did not specify what the investigators were authorized to search, seize, and analyze from the mobile phone. The search authority did not testify at the hearing on this motion.[14]

When the agents executed the authorization and seized Appellant's phone, Appellant told an agent that it was a new phone and, "The messages that you are looking for are still on there," or words to that effect.

SA LB searched Appellant's phone for text messages by opening its message application. SA LB explained, "the way the I-phone works is it shows all

---

[13] Air Force Form 1176, *Authority to Search and Seize* (Mar. 2016).

[14] Trial counsel told the military judge that the search authority was out of the country and was unable to be reached.

the recent messages first, by contact, and then the only text that shows up is the most recent text message exchange." She then "did a precursory real quick [search] to identify any other witnesses in the case, and to see if [she would] find [AW's] and [Appellant's] – or [AW's] and [TD]'s text messages." She noted AW and TD were not saved as contacts, but she "knew the phone numbers and [she] knew what phone numbers to look for." She recognized the name of one contact as a defense counsel, and specifically did not look through messages involving that contact, explaining that the attorney-client privilege limited her authority to search.

In addition to scanning the most recent text messages, she did key word searches, including "OSI," to find out whether any texts were relevant to her investigation of AW's reported sexual assault. SA LB did not testify that she was able to limit her word searches to a specific time frame. SA LB also looked at conversations with individuals who were not saved as contacts in Appellant's phone and identified only by telephone number, "just to see who it was or what they were talking about." She found messages that she believed indicated KA was sexually assaulted by KS and Appellant was a potential witness. SA LB explained that because AFOSI is "required to investigate an allegation of sexual assault we come across even though it stated that she had filed a restricted report[, w]e had to initiate an entire sexual assault investigation."

When AFOSI agents interviewed Appellant as a witness about that other alleged sexual assault of KA, he provided them the name of DS. AFOSI agents interviewed DS, who relayed Appellant sent him a text message[15] that stated something like "Funny thing is I was inside her earlier," referring to KA. At this point in her investigation, SA LB "had no reason to believe" any sexual activity between Appellant and KA was nonconsensual.

When AFOSI agents first contacted KA and asked if she knew Appellant, she was surprised and then upset; KA's report of sexual assault was restricted. At trial, she explained she decided to cooperate with AFOSI:

> Knowing that there was another victim and that he—after I confronted him apparently he didn't learn from the mistake with me, and that he went and did something to somebody else possibly worse. So that motivated me to come forward and help out with the case with my story.

KA had never met AW.

Appellant's mobile phone locked itself while in AFOSI's possession. SA LB had not been able to perform a data extraction because the phone was a new

---

[15] This message was located on DS's phone, but not on Appellant's phone.

model. Therefore, she sent the phone to the Defense Computer Forensics Laboratory (DCFL) to examine and analyze text messages pertaining to sex offenses. SA LB testified that she requested DCFL examine Appellant's phone for messages relating to the investigation of KS as well as Appellant. DCFL's examination yielded evidence of Appellant's communications concerning KA and AW.

### 2. Law and Analysis

#### a. Standards of Review

"The exclusionary rule is a judicially created remedy for violations of the Fourth Amendment." *United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014) (citation omitted). The President has applied the rule to the military, through Mil. R. Evid. 311(a):

> Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if: (1) the accused makes a timely motion to suppress or an objection to the evidence under this rule; (2) the accused had a reasonable expectation of privacy in the person, place, or property searched . . . ; and (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.

We review a military judge's ruling on a motion to suppress evidence based on a Fourth Amendment violation for an abuse of discretion. *United States v. Khamsouk*, 57 M.J. 282, 286 (C.A.A.F. 2002) (citation omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). However, "[a] military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). "In reviewing a ruling on a motion to suppress, we consider the evidence in the light most favorable to the prevailing party." *United States v. Cowgill*, 68 M.J. 388, 390 (C.A.A.F. 2010) (citation omitted). "We review de novo questions regarding whether a search authorization is overly broad." *United States v. Richards*, 76 M.J. 365, 369 (C.A.A.F. 2017) (citing *United States v. Maxwell*, 45 M.J. 406, 420 (C.A.A.F. 1996)).

#### b. Fourth Amendment Protection

Data stored within a cell phone falls within the protection of the Fourth Amendment. *Wicks*, 73 M.J. at 99. When a person sends letters, messages, or

other information electronically, their "Fourth Amendment expectation of privacy diminishes incrementally" as the receivers can further share the contents. *Maxwell*, 45 M.J. at 417. "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Riley v. California*, 573 U.S. 373, 393 (2014). Such phones have a "[multiple gigabyte] capacity with the ability to store many different types of information: Even the most basic phones that sell for less than $20[.00] might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." *Riley*, 573 U.S. at 394. "A search authorization . . . for an electronic device[ ] must adhere to the standards of the Fourth Amendment of the Constitution." *Richards*, 76 M.J. at 369.

In *United States v. Osorio*, this court addressed requirements regarding search warrants for computers—and by extension for stored electronic or digital media—when evidence of another crime is discovered, stating,

> [T]here must be specificity in the scope of the warrant which, in turn, mandates specificity in the process of conducting the search. Practitioners must generate specific warrants and search processes necessary to comply with that specificity and then, if they come across evidence of a different crime, stop their search and seek a new authorization.

66 M.J. 632, 637 (A.F. Ct. Crim. App. 2008).

 "Searches of electronic devices present distinct issues surrounding where and how incriminating evidence may be located." *Richards*, 76 M.J. at 370. The United States Court of Appeals for the Armed Forces (CAAF) further explained:

> In charting how to apply the Fourth Amendment to searches of electronic devices, we glean from our reading of the case law a zone in which such searches are expansive enough to allow investigators access to places where incriminating materials may be hidden, yet not so broad that they become the sort of free-for-all general searches the Fourth Amendment was designed to prevent.

*Id.*

### c. Search Authorization Expiration

The military judge addressed the assertion that the search authorization expired three days after it was issued. He found that, by its terms, the search authorization required *initiation* of the search within three days. He further found that on the first day after receiving authorization, SA LB "conducted an immediate search of the phone when she performed a scroll search and took

steps to prevent the phone from locking." As SA LB initiated the search within those three days, "[AF]OSI was allowed to take further steps in analyzing and collecting [Appellant's] cellular data thereafter." We find the military judge did not err in his findings of fact and conclusions of law regarding Appellant's claim that the authorization to search had expired.

### d. Search Authorization Scope

The military judge noted "[t]he Defense does not challenge the validity of [the commander's] search authorization, *per se*; instead, it challenges primarily the scope of the authorizations," then concluded that the commander "had a substantial basis for determining that probable cause existed for the AFOSI agent to search the accused's phone."[16] In his analysis on potential deterrence of SA LB, he stated that "[i]f an error exists in this case, the error rests with the issuing commander who signed the [AF]1176 without it indicating a more narrow scope of his search authorization." Similarly, here Appellant challenges the scope rather than the basis for the search authorization.

An overly broad warrant can result in a general search prohibited by the Fourth Amendment, an issue we review de novo. *Maxwell*, 45 M.J. at 420. "The fact that the [warrant] application adequately described the 'things to be seized' does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (citing *United States v. Stefonek*, 179 F.3d 1030, 1033 (7th Cir. 1999) ("The Fourth Amendment requires that the *warrant* particularly describe the things to be seized, not the papers presented to the judicial officer . . . asked to issue the warrant.") (omission in original) (additional citation omitted)).

In *Groh*, the warrant stated the items to be seized consisted of a "single dwelling residence . . . blue in color." *Id.* at 558 (omission in original). While the affidavit accompanying the application for the warrant described things to be seized, including firearms and receipts, the warrant neither described those things nor incorporated any items from the affidavit by reference. The United States Supreme Court found the warrant failed to describe the items to be seized at all, and it was "so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." *Id.*

In this case, the military judge did not make any findings of fact as to the scope of the search authorization. Instead, he concluded: "The search authorization was not overbroad, and SA [LB]'s subsequent manual searches of the

---

[16] We agree with the military judge that probable cause existed to search Appellant's phone—at least for text messages between Appellant, AW, and TD which were sent around the time of the sexual assault.

accused's phone were within the scope of [the search authority's] authorization." Unlike the military judge, we find the search authorization was overbroad in scope. It authorized a search of the "mobile device" writ large and failed to identify the data contained on the device for which the Government had probable cause to seize, i.e., text messages related to AW's allegation of sexual assault. Thus, the searches based on this search authorization were unlawful under the Fourth Amendment and are subject to exclusion. We next consider exceptions to the exclusionary rule.

### e. Good Faith Exception

"Under the 'good faith' exception to the exclusionary rule, evidence obtained pursuant to a search warrant that was ultimately found to be invalid should not be suppressed if it was gathered by law enforcement officials acting in reasonable reliance on a warrant issued by a neutral and detached magistrate." *United States v. Hernandez*, 81 M.J. 432, 440 (C.A.A.F. 2021) (citing *United States v. Leon*, 468 U.S. 897, 918 (1984)). "The good-faith exception is a judicially created exception to th[e] judicially created [exclusionary] rule." *Davis v. United States*, 564 U.S. 229, 248–49 (2011). The Supreme Court in *Davis* held that the "blameless police conduct" in that case—acting in accordance with binding legal precedent at the time—"comes within the good-faith exception and is not properly subject to the exclusionary rule." *Id.* at 249; *cf.* Mil. R. Evid. 311(c)(4) (providing an exception separate from the good-faith exception for searches involving "objectively reasonable reliance on a statute or on binding precedent later held violative of the Fourth Amendment").

The Supreme Court identified four circumstances in which the "good faith exception" will *not* apply: (1) where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) where the magistrate "wholly abandoned his judicial role;" (3) where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is so "facially deficient . . . in failing to particularize the place to be searched or the things to be seized . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (citations omitted).

Mil. R. Evid. 311(c)(3) provides that evidence obtained through an unlawful search *may* be used if:

> (A) the search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization . . . [or warrant] . . .;

(B) the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and

(C) the officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant.

The CAAF has harmonized the four *Leon* exceptions with the three requirements under Mil. R. Evid. 311(c)(3). "[Mil. R. Evid.] 311(c)(3)(B) addresses the first and third exceptions noted in *Leon, i.e.*, the affidavit must not be intentionally or recklessly false, and it must be more than a bare bones recital of conclusions," and "[Mil. R. Evid.] 311(c)(3)(C) addresses the second and fourth exceptions in *Leon, i.e.*, objective good faith cannot exist when the police know that the magistrate merely rubber stamped their request, or when the warrant is facially defective." *Hernandez*, 81 M.J. at 440–41 (internal quotation marks and citations omitted) (citing *United States v. Carter*, 54 M.J. 414, 421 (C.A.A.F. 2001)).

"Good faith is to be determined using an objective standard." Mil. R. Evid. 311(c)(3)(C). The "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23). We further "consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." *Leon*, 468 U.S. at 923 n.24.

The military judge considered and found no exceptions as outlined in *Leon*, 468 U.S. at 923–24, to bar application of the good-faith doctrine in this case. In particular, he concluded "[t]he search authority [sic] was not facially deficient."

We disagree, and find the fourth *Leon* exception clearly applies in this case—that the search authorization was facially deficient in not limiting the scope of the search such that investigators cannot reasonably have presumed it to be valid. The scope of the search authorization on its face was "mobile device with biometric access," with no indication of what to look for inside the device. That may have been sufficient if the item of interest was the phone itself instead of information contained within it. But here the search authorization allowed the search of all data in Appellant's mobile phone for any purpose. SA LB drafted the search authorization and believed that when there is "probable cause for anything on the phone, [she] can search everything on the phone" because "[i]f the warrant allows for the entire phone to be seized, then all the data on the phone becomes property of the [G]overnment and can be

searched at any time."[17] SA LB was wrong in her belief that the law allows such a broad search. The fact that SA LB initially limited her search of the phone to any evidence of Appellant's crime against AW does not change the clearly overbroad nature of the search authorization. We find the search authorization to be facially deficient, and that those executing the search reasonably should have noticed the deficiency. Thus, we find the good-faith exception does not apply and that SA LB's search based on the deficient authorization was warrantless. *See Groh*, 540 U.S. at 558.

### f. Inevitable Discovery

"Evidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made." Mil. R. Evid. 311(c)(2). As the CAAF has explained:

> The doctrine of inevitable discovery allows for the admission of illegally obtained evidence when the [G]overnment "demonstrate[s] by a preponderance of the evidence that when the alleged illegality occurred, the [G]overnment agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence in a lawful manner."

*United States v. Eppes*, 77 M.J. 339, 347 (C.A.A.F. 2018) (second alteration in original) (quoting *Wicks*, 73 M.J. at 103); *see also United States v. Hoffman*, 75 M.J. 120, 124–25 (C.A.A.F. 2016). "The doctrine may apply where it is reasonable to conclude officers would have obtained a valid authorization had they known their actions were unlawful." *Id*.

"Evidence derived from an unlawful search constitutes 'fruit of the poisonous tree' and is subject to exclusion." *United States v. Garcia*, 80 M.J. 379, 388 (C.A.A.F. 2020) (citations omitted). "The only *true* poisonous fruit is evidence that was gathered as a *result* of the unlawful search." *Id*. at 389.

Appellant asserts that when SA LB searched Appellant's phone, "[AF]OSI had no knowledge of [KA], [DS], or any text messages from the weekend of 8 September 2018. Had the authorization been appropriately particularized in scope, these messages would never have been discovered."

---

[17] While SA LB may have been referring to the concept that a person has no expectation of privacy in a Government-created *copy* of their personal data, she searched the Appellant's actual phone and was unable to make a copy. *See, e.g., United States v. Lutcza*, 76 M.J. 698, 702 (A.F. Ct. Crim. App. 2017); *United States v. Campbell*, 76 M.J. 644 658 (A.F. Ct. Crim. App. 2017).

The military judge's analysis of inevitable discovery was limited to quoting with approval the Government's response to the Defense motion. That response stated, in part, "By the time that [SA LB] requested DCFL perform a data extraction and forensic report, she had been provided with incriminating text messages from both [DS] and KA. This, together with the fact that [Appellant] had a habit of discussing sexual encounters via text message, [SA LB] could have very easily applied for an additional AF [ ] 1176 to get authorization to look deeper into [Appellant's] phone if it had been necessary."

The military judge's adopted reasoning overlooks the fact that those "incriminating text messages" and Appellant's "habit" were discovered initially through SA LB's unlawful search of Appellant's phone. The Government has not shown by a preponderance of evidence that such communications and habit were discoverable, much less discovered, from other investigative actions.

Any evidence SA LB found as a result of her unlawful search of Appellant's phone was tainted and could not form the basis of a new search authorization or any other method leading to their discovery. We see little evidence that SA LB or other AFOSI agents were working on other leads regarding who Appellant might have messaged about his sexual encounters, his encounters with AW specifically, or his encounters with KA.[18]

Regarding Appellant's text messages with AW and TD relating to the alleged sexual assault of AW, we find those inevitably would have been discovered. Had SA LB known her search authorization was invalid, we are confident she would have presented to the search authority an authorization properly narrowed in scope and received approval in return. We are not convinced, however, that such authorization would include a search through *all* of Appellant's text messages for *any evidence* that might be relevant to AW's allegation of sexual assault, as investigators had no reason to believe such evidence existed. Similarly, we cannot presume SA LB's search for other types of information, other sexual encounters, other time periods, and the word "OSI" would have been within the scope of a valid search authorization. Thus, it is not inevitable that evidence of Appellant's sexual assault of KA would have been discovered.

---

[18] SA LB testified that other AFOSI agents interviewed pilots who interacted with the cadets on the AFROTC trip, and she believed KS was interviewed. The agents did not ask KS whether he communicated with Appellant via text message. When SA LB read messages with KA, she saw reference to someone she believed was KS, whom she knew was friends with Appellant. SA LB then initiated an investigation into KS's conduct with KA, which ultimately resulted in no prosecution.

### g. Plain View

[O]ne exception to the warrant requirement for items not otherwise subject to a lawful search is the plain view doctrine, which allows law enforcement officials conducting a lawful search to seize items in plain view if they are acting within the scope of their authority and have probable cause to believe the item is contraband or evidence of a crime.

*United States v. Gurczynski*, 76 M.J. 381, 387 (C.A.A.F. 2017) (citing *United States v. Fogg*, 52 M.J. 144, 149 (C.A.A.F. 1999)).

The plain view doctrine permits an investigator to seize evidence, without a warrant or search authorization, if that "person while in the course of otherwise lawful activity observes in a reasonable fashion . . . evidence that the person has probable cause to seize." Mil. R. Evid. 315(c)(5)(C); *see also Fogg*, 52 M.J. at 149–50.

The military judge concluded that SA LB was "lawfully in the location where she saw the evidence." This conclusion, of course, flows from the military judge's previous conclusion that the search authorization was not overly broad. As we find it was overbroad—and the good faith doctrine does not apply— SA LB was not lawfully permitted to search Appellant's phone. As such, SA LB could not have been "in the course of otherwise lawful activity" while she was reading the messages, ergo the plain view doctrine does not apply.

### h. Exclusionary Rule and Deterrence

Finally, we consider whether evidence obtained through an unlawful search, and for which no other exception to the exclusionary rule applies, must be excluded in this case as a deterrent measure that outweighs the "substantial social costs." *Leon*, 468 U.S. at 907. In this regard, we consider whether the search authority's or SA LB's actions were "deliberate, reckless, or grossly negligent" or part of "recurring or systemic negligence." We find they were not and that exclusion is not warranted. *Herring*, 555 U.S. at 144.

At the hearing on the defense motion to suppress, SA LB explained the process she used to obtain authority to search Appellant's phone. She stated, "It's standard protocol for us to draft the affidavit [supporting the search authorization], and then have the legal office review it to ensure that . . . there is probable cause." Moreover, a judge advocate from the base legal office was present when she briefed the search authority.[19] SA LB said the search authority was

---

[19] The judge advocate also testified, but remembered very little about the scope of the search authorization.

familiar with the case, and asked some questions, including about the biometric aspect of the authorization.

On cross-examination, trial defense counsel asked SA LB about her understanding of the scope of the search authorization:

> Q [Trial Defense Counsel]: And you looked at the messages between [Appellant] and the unknown number that was [ ] later determined to be [KA]?
>
> A [SA LB]: Yes. So the probable cause gives us authority to search the phone for any evidence of the specific crime, so looking through [KS's] messages, he was a witness to the circumstances surrounding the interactions with [AW], so that would potentially lead to evidence of the crime.
>
> . . .
>
> Q: And so you took that to mean that you could search the whole phone?
>
> A: Yes. That's what was written in the authority.
>
> . . .
>
> Q: So within these last two years, has this been your standard practice for [ ] phone searches?
>
> A: Yes.
>
> Q: That when there's probable cause for anything on the phone, you can search everything on the phone?
>
> A: Yes. If the warrant allows for the entire phone to be seized, then all the data on the phone becomes the property of the [G]overnment and can be searched at any time.
>
> Q: And in those previous cases, it is you or whoever the [AF]OSI agent is that's the individual who is putting in [ ] those parameters for the search authorization?
>
> A: Yes. Those parameters are discussed with [ ] legal, and we determine whether or not the parameters become [a question of], you know, physical capability of putting parameters through [trying to get best] evidence, you can't chop a phone in half to

> get, you know, certain messages. And the phone is also [best] evidence.[20]

SA LB described finding messages regarding KA in plain view while looking at messages with KS, explaining,

> we were taught, you know, in FLETC[21 . . . if] I have a right to be in the phone, and I see something that leads me to believe there's evidence of a crime, just like we did with finding the other allegation of a sexual assault, that's in play. So there was no need to get an expanded scope.

Additionally, SA LB believed she had authority to search Appellant's phone not only for communications with AW and TD, but to look for other witnesses in the case.

Exclusion of evidence "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence" and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis v. United States*, 564 U.S. 229, 237 (2011) (citing *Herring*, 555 U.S. at 141). In *Herring*, the Supreme Court spoke in detail on application of the exclusionary rule, including stating,

> The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies. Indeed, exclusion "has always been our last resort, not our first impulse," and our precedents establish important principles that constrain application of the exclusionary rule.

555 U.S. at 140–41 (citations omitted).

These constraints include that the exclusionary rule applies "only where it result[s] in appreciable deterrence" and "the benefits of deterrence outweigh the costs." *Id.* at 141 (alteration in original) (internal quotation marks omitted) (citing *Leon*, 468 U.S. at 909–10). "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143.

> When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But

---

[20] The transcript is in error. We quote from the audio recording of this portion of the proceeding. *See also* n.22, *supra*.

[21] We understand this to refer to her training to be a special agent at a Federal Law Enforcement Training Center.

> when the police act with an objectively reasonable good-faith be-
> lief that their conduct is lawful, or when their conduct involves
> only simple, isolated negligence, the deterrence rationale loses
> much of its force, and exclusion cannot pay its way.

*Davis*, 564 U.S. at 238 (internal quotation marks omitted) (first citing *Herring*,
555 U.S. at 144, 137; and then citing *Leon*, 468 U.S. at 909, 919, 908, n.6).

In this case, the military judge at length considered deterrence and the cost
to the justice system of excluding the evidence. He stated "[e]xclusion of this
evidence under these facts will not deter future actions by military law enforce-
ment personnel." He determined SA LB's conduct was neither "deliberate
enough to yield meaningful deterrence [or] culpable enough to be worth the
price paid by the justice system."

Similarly, we find SA LB's conduct does not warrant exclusion of evidence
in this case to deter future unlawful searches; that benefit does not outweigh
the costs to the justice system. *See Herring*, 555 U.S. at 144 n.4 ("[W]e do not
suggest that the exclusion of this evidence could have *no* deterrent effect . . .
and here exclusion is not worth the cost."). In this regard, the military judge
made three important findings. First, he found that "SA [LB] acted reasonably
– especially considering the nature of digital evidence and the realties [sic]
faced when attempting to search and analyze the same without knowing po-
tentially involved parties' phone numbers." Second, and related, the military
judge found "it is clear from the evidence that SA [LB] did not" violate Appel-
lant's rights under the Fourth Amendment "deliberately, recklessly, or with
gross negligence." To the extent these conclusions are findings of fact in a
mixed question of fact and law, we determine they are not clearly erroneous.
Third, the military judge found that "any wrong done to the accused's rights
was by accident, [and] not design," and that it had not been shown that this
case "involve[d] any recurring or systemic negligence on the part of law en-
forcement." These findings are supported by the evidence and not clearly erro-
neous.

We agree with the military judge that SA LB's conduct was not deliberate,
reckless, or grossly negligent, or even indifferent or wanton.[22] She thought she
was doing what the law allowed. She coordinated with the legal office before
and while requesting search authorization. She limited her search to text mes-

---

[22] The Supreme Court in *Herring* did not define the term "gross negligence," and such
phrase has been defined myriad ways. *See generally*, Andrew Guthrie Ferguson, *Con-
stitutional Culpability: Questioning the New Exclusionary Rules*, 66 Fla. L. Rev. 623
(2014). Our review of the law indicates gross negligence is more than ordinary negli-
gence, but less than intentional conduct.

sages. She focused her search on finding evidence related to AW's claim of sexual assault, including what Appellant may have told others about it. She was careful to avoid reading what she believed were privileged communications. She believed she found messages regarding KA "while she had a right to be in the phone," and so did not pursue an expanded search authorization.

Most importantly, while SA LB testified about *her* "standard practice" for searching phones, she did not quantify those searches, indicate how many involved such sweeping search authorizations, or suggest that her practice was also AFOSI's. No one else from AFOSI, and no one from FLETC, testified about training or standard practices in obtaining an authorization to search a phone, and how to conduct the search. The record provides inadequate support to conclude that SA LB's actions in searching Appellant's phone were either recurrent or representative of law-enforcement practices, and therefore we cannot conclude that exclusion of the evidence would address "recurring or systemic negligence." *Herring*, 555 U.S. at 144. Exclusion of the evidence seized because of her unlawful search is far too drastic a response to make her aware of her mistaken ideas and help ensure her conduct is not repeated.

The search authority relied on the experience of SA LB and a judge advocate. From our reading of the record, it appears the search authority intended to authorize a search of Appellant's phone for text messages SA LB expected to find, not to authorize a rummage for anything that might be interesting for AFOSI's investigation into Appellant. Exclusion of the evidence seized because the search authority authorized an overly broad search in this case is not warranted to deter such conduct in the future.

We find the dissenting opinion's comparison to *Davis* inapt. While the Supreme Court at length addressed deterrence and the costs to the justice system, its holding was rooted in the good-faith exception to the exclusionary rule. *Davis*, 564 U.S. at 249 ("That sort of blameless police conduct, we hold, comes within the good-faith exception and is not properly subject to the exclusionary rule."). It did not reach the question of whether, if the good-faith exception did not apply, the evidence should have been suppressed to deter future police misconduct.

The costs to the justice system have myriad sources. We highlight two in this case: the magnitude of the violation and the victims of the crime. In this case, SA LB retrieved messages between Appellant and (1) a known victim (AW), (2) a known witness (TD), (3) known associates of Appellant (DS, AS, and KS), and (4) Appellant's father. Because Appellant communicated via text message to these individuals, he lost control over the further dissemination of his statements, resulting in a corresponding reduction in his expectation of privacy therein. *See Maxwell*, 45 M.J. at 417. Moreover—and related to the concept of inevitable discovery—Appellant's phone was not the only connection

between the events with KA and with AW. KS and Appellant's father had some information relating to Appellant's interaction with both KA and AW; they could have turned over to investigators their copies of messages with Appellant without violating Appellant's rights. In summary, the costs to the justice system when we exclude evidence due to a Fourth Amendment violation grow higher as the person's expectation of privacy in that evidence is diminished.

Additionally, when we weigh the "substantial social costs" of suppression, "which sometimes include setting the guilty free and the dangerous at large," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), we consider the particular case and the scope of those who would suffer the costs. Society's interest in justice is understandably higher when the crime involves a particular victim. Here, Appellant was charged with sexual assault and abusive sexual contact against two victims—KA and AW. These are not "victimless crimes." Moreover, convictions for these crimes demonstrate Appellant was a repeat offender from whom society needed protection. Exclusion would not just impact society in general, but particular members of society, and potential future victims. In this case, exclusion of the evidence retrieved from Appellant's phone would result in high social costs and speculative deterrence.

The analysis of the exclusionary rule is different when we consider a witness's live testimony as derivative evidence. "Unlike real or documentary evidence, live-witness testimony is the product of 'will, perception, memory and volition.'" *United States v. Kaliski*, 37 M.J. 105, 109 (C.M.A. 1993) (citation omitted). And "since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *United States v. Ceccolini*, 435 U.S. 268, 278 (1978). Our system of justice has a "strong interest . . . of making available to the trier of fact all concededly relevant and trustworthy evidence." *Id.*

When the identity of a witness was discovered due to illegal police activity, we use the factors set out in *Ceccolini* to determine whether the witness's testimony should be excluded:

> (1) The degree of free will exercised by the witness in testifying; (2) The time lapse between the time of the illegal search and the initial contact with the witness, as well as the lapse of time between initial contact and testimony at trial; (3) The role the illegal law enforcement activity had in obtaining the witness testimony; (4) The purpose and flagrancy of the law enforcement conduct; and (5) The cost-benefit analysis, comparing the cost of excluding live-witness testimony and permanently silencing a witness with the beneficial deterrent effect.

*United States v. Mancini*, No. ACM 38783, 2016 CCA LEXIS 660 at *32–34 (A.F. Ct. Crim. App. 7 Nov. 2016) (unpub. op.) (citing *Ceccolini*, 435 U.S. at 276, 279–80); *see also United States v. Jones*, 64 M.J. 596, 605–10 (A. Ct. Crim. App. 2007) (applying the five *Ceccolini* factors).

In this case, we find the factors overall weigh against exclusion of KA's testimony. KA reported Appellant's conduct in a restricted report four months before she was contacted by AFOSI agents. Nevertheless, KA's allegation against Appellant was not a secret. DS and KS were aware of her allegation. When KA learned that "there was another victim," she chose to cooperate with Appellant's prosecution. Although she learned from AFOSI that Appellant was under investigation for a sexual offense against another woman, if she had instead heard about it through others, like fellow officers, it is reasonable to conclude she likewise would have chosen to cooperate in the prosecution. The one factor that weighs for exclusion is the purpose of SA LB's search: she conducted a warrantless search of Appellant's text messages for evidence of other victims. On the whole, we agree with the military judge's legal conclusion that even if excluding KA's testimony would "result in appreciable deterrence to SA [LB] . . . such deterrence does not out-weigh the costs to the justice system of excluding the live testimony of this particular witness." The military judge did not abuse his discretion in allowing KA to testify on the merits.

We conclude the military judge did not abuse his discretion in ruling the text messages were admissible because we do not find "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a)(3).

## C. Findings Instructions

In his initial brief to this court, Appellant claimed the military judge failed to instruct the court members on the intent to gratify sexual desires, as charged in Specification 4 of the Charge. The Government replied, correctly identifying where the military judge did, in fact, instruct on this intent element. In Appellant's reply brief, he acknowledged his mistake, and claimed this error related to Specification 5 of the Charge. Appellant did not make a motion to amend his initial brief to correct his error. *See* JT. CT. CRIM. APP. R. 23.3(n). The Government did not submit any filing in response to the purportedly changed assignment of error.

### 1. Additional Background

Specifications 4 and 5 of the Charge alleged Appellant committed the acts upon AW "with an intent to gratify his sexual desires." Shortly after the court-martial was assembled, the military judge asked the court members "to read the Charge and its Specifications on that flyer that is provided" in a folder for

each member. The flyer, Appellate Exhibit XXXII, accurately reflects the charged language in Specifications 4 and 5 of the Charge. In the Government's opening statement, the trial counsel stated that it would be asking the court members to "find [Appellant] guilty of a number of specifications listed on the flyer found in the folders in front of you."

The military judge instructed the court members both orally and in writing of the elements of the charged specifications. For Specification 4, the military judge stated the first element was, "That . . . [Appellant] committed a sexual act upon [AW] by penetrating her vulva with his finger, with an intent to gratify his sexual desires." For the elements of Specification 5, the military judge made no mention of intent. He stated the first element was, "That . . . [Appellant] committed sexual contact upon [AW] by touching the nipple of [AW] with his mouth." The military judge then defined "sexual contact," which included, "touching . . . [the breast] . . . with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person."

Both before and after the military judge provided the members instructions on Specifications 4 and 5, he gave counsel the opportunity to object or request additional instructions. Trial defense counsel did not raise the issue before the instructions were read, and had no objection or request for additional instruction afterwards. The court members did not interrupt their deliberations to ask the military judge any questions.

**2. Law**

"Failure to object to an instruction or to omission of an instruction before the members close to deliberate forfeits the objection." R.C.M. 920(f). "But, when counsel affirmatively decline[s] to object and offers no additional instructions, counsel expressly and unequivocally acquiesce[s] to the military judge's instructions, and his actions thus constitute waiver." *United States v. Rich*, 79 M.J. 472, 476 (C.A.A.F. 2020) (alterations in original) (internal quotation marks omitted) (citing *United States v. Davis,* 79 M.J. 329, 332 (C.A.A.F. 2020)). However, pursuant to Article 66(d), UCMJ, 10 U.S.C. § 866(d), the Courts of Criminal Appeals (CCA) have the unique statutory responsibility to affirm only so much of the findings and sentence that they find is correct and "should be approved." This includes the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g., United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018). CCAs assess the entire record and determine "whether to leave an accused's waiver intact, or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016).

"The military judge has an independent duty to determine and deliver appropriate instructions." *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citing *United States v. Westmoreland*, 31 M.J. 160, 163–64 (C.M.A. 1990)).

This duty includes giving required instructions that include "[a] description of the elements of each offense charged." R.C.M. 920(e)(1).

### 3. Analysis

We have reviewed the entire record, and have determined to leave intact Appellant's waiver of error relating to the instructions on the elements of Specifications 4 and 5.[23] We are confident that the members in this case understood Appellant was charged in those specifications with committing acts upon AW with the intent to gratify his sexual desires, and not some other intent, before finding him guilty as charged.

## D. Character Testimony about AW

Appellant claims "the [m]ilitary [j]udge erred in allowing improper forms of evidence, including specific instances of conduct, to be introduced," relating to AW's character. The particular traits Appellant identified are "character for truthfulness" and "character for high performance and effort and her affinity for the Air Force."

### 1. Additional Background

After the Defense challenged AW's credibility on cross-examination, the Government called Lieutenant Colonel (Lt Col) ON as a witness. Lt Col ON was AW's ROTC detachment commander at the time of the offenses. She did not attend the trip to Luke AFB, but she gave the order that the cadets would not be allowed to drink alcohol.

The last morning of the trip, Capt ST, a senior cadre member, called Lt Col ON and told her AW had been assaulted. Later that day, AW called Lt Col ON and directly reported the assault. Initially, AW did not admit to Lt Col ON that she had been drinking during the trip, but later—after Lt Col ON learned that several cadets drank during the trip—told Lt Col ON she had been drinking.

Lt Col ON testified about disciplinary actions and consequences that could flow from violating her no-drinking order. Thereafter, the following exchange with trial counsel occurred:

---

[23] Although Appellant failed to amend this assignment of error in his brief to include Specification 5, we elected to consider it as well as his claimed error regarding Specification 4. We note that in his assignment of error regarding ineffective assistance of counsel for failing to object to the military judge's instructions (issue (8)), Appellant claims error with respect to Specification 5.

Q [Trial Counsel]: So with all this in mind, did you ever think at any time that [AW] was accusing [Appellant] of sexual assault just so she could get out of trouble?

A [Lt Col ON]: No.

Q: And why not?

[Trial Defense Counsel]: Objection, speculation, Sir.

[Military Judge]: I'm going to overrule the objection. I'll allow it.

A: Historically, [AW] was a high performing cadet and historically she had owned her mistakes. I had, if anything, observed that she was forthcoming, even to her own detriment at times because she was committed to integrity, which is what we teach them they have to be. And so I didn't have any reason to doubt her.

Q: You just mentioned that she had come forward in the past and told you things to her detriment. Do you have an example of that?

[Military Judge]: I'm not going to allow that question.

Lt Col ON next described AW's status in ROTC at the time of the trip, which led to testimony about AW being medically disqualified from commissioning based on a self-reported medical issue. The following exchange drew no objection from the Defense:

Q [Trial Counsel]: So, when [AW] receives the news that she's been medically disqualified, how did she handle that situation, from your perspective?

A [Lt Col ON]: Well, she was emotional. . . . [S]he, in particular, has not ever envisioned any future for herself that was not being an Air Force officer because she was an Air Force brat, her dad's a retired master sergeant, and that's just—that was really the fabric of who she is.

Q: So after she's told that she's been medically disqualified, how did she respond to that when it came to training and being involved in ROTC and giving it her full participation?

A: Well, she continued to give it 100 percent. You know, like I said, she's very high performing, and so while it was an emotional event for her, she continued to participate—as long as I was willing to let her participate, she wanted to continue to participate as if nothing had changed.

Lt Col ON ultimately disciplined AW and other cadets for violating her no-drinking order. Lt Col ON also testified that she had awarded AW her "commander's scholarship" in AW's sophomore year, and helped AW contest the medical disqualification.

**2. Law**

"A witness' credibility may be attacked or supported by testimony about the witness' reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. Evidence of truthful character is admissible only after the witness' character for truthfulness has been attacked." Mil. R. Evid. 608(a). "[E]xtrinsic evidence is not admissible to prove specific instances of a witness' conduct in order to attack or support the witness' character for truthfulness." Mil. R. Evid. 608(b).

"Under [Mil. R. Evid.] 608 . . . , a party may introduce opinion evidence regarding the general character of a person for truthfulness. The authority to introduce such opinion evidence, however, does not extend to 'human lie detector' testimony—that is, an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case." *United States v. Kasper*, 58 M.J. 314, 315 (C.A.A.F. 2003) (citing *United States v. Whitney*, 55 M.J. 413, 415 (C.A.A.F. 2001) (additional citation omitted)); *see also United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007).

> If a witness does not expressly state that he believes a person is truthful, we examine the testimony to determine if it is the "functional equivalent of" human lie detector testimony. Testimony is the functional equivalent of human lie detector testimony when it invades the unique province of the court members to determine the credibility of witnesses, and the substance of the testimony leads the members to infer that the witness believes the victim is truthful or deceitful with respect to an issue at trial.

*United States v. Martin*, 75 M.J. 321, 324–25 (C.A.A.F. 2016) (citations omitted).

When a witness gives human-lie-detector testimony, however, the military judge must provide the members an instruction as to how they may, and may not, consider such testimony. *See Kasper*, 58 M.J. at 318–20.

"Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citations omitted). "A timely and specific objection is required so that the court is notified of a possible error, and so has an opportunity to correct the error and obviate the need for appeal." *Id*. To establish plain error, "[the] appellant must convince us that

(1) there was error; (2) that it was plain or obvious; and (3) that the error materially prejudiced a substantial right. We will reverse for plain error only if the error had 'an unfair prejudicial impact' on the findings or sentence." *United States v. Schlamer*, 52 M.J. 80, 85–86 (C.A.A.F. 1999) (citation omitted). "[T]he lack of defense objection is relevant to a determination of prejudice"; it indicates "some measure of the minimal impact." *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999) (internal quotation marks and citations omitted) (discussing plain error in the context of trial counsel's improper argument).

### 3. Analysis

#### a. Character

Appellant claims the military judge erred in allowing the Government to introduce evidence of AW's character traits, allowing specific examples of those traits, and bolstering AW's credibility. First, we have determined that defense counsel's objection based on speculation was not sufficient to preserve Appellant's objection to human-lie-detector testimony. While such testimony may be speculative, the military judge was not on notice that this issue was at the heart of Defense's speculation objection. Therefore, we review for plain error. *See Knapp*, 73 M.J. at 36.

Unlike human-lie-detector testimony, character-for-truthfulness testimony is admissible, under Mil. R. Evid. 608(a), in the form of an opinion. Lt Col ON had a foundation to provide an opinion on AW's truthfulness. Trial counsel's questions to elicit such opinion were not well crafted, but in the end revealed that Lt Col ON had a high opinion of AW's truthfulness. Although defense counsel had objected to the line of questioning based on speculation—not on lack of foundation or improper character evidence—the military judge's rulings regarding her testimony show he was oriented to the issue of character.

We agree with the Government's concession that "Lt Col ON's testimony pushed the bounds of what might constitute reputation or opinion testimony; however it did not plainly cross the line into specific instances within the meaning of Mil. R. Evid. 608(b)." Lt Col ON's descriptions of AW as "a high performing cadet and historically she had owned her mistakes" and "was committed to integrity" are not specific instances of conduct prohibited by Mil. R. Evid. 608(b). When trial counsel asked Lt Col ON a follow-up question that would elicit a specific instance of conduct relating to truthfulness ("Do you have an example of that?"), the military judge *sua sponte* interrupted and did not allow the witness to answer.

Appellant next claims that, contrary to Mil. R. Evid. 404(a), Lt Col ON testified about other character traits of AW—specifically character for high performance and effort and her affinity for the Air Force. Appellant claims this was "improperly introduced in order to bolster [AW's] credibility at trial." The

Government argues on appeal that this testimony was to "'explain, repel, counteract or disprove the evidence introduced by the opposing party'" (quoting *United States v. Wirth*, 18 M.J. 214, 218 (C.M.A. 1984), specifically "the defense theory that AW concocted this allegation of sexual assault to protect her future Air Force career."

Mil. R. Evid. 404(a)(1) prohibits evidence of a person's character or character trait "to prove that on a particular occasion the person acted in accordance with the character or trait." Appellant does not explain how testimony that AW was a high performer, displayed effort, and had an affinity for the Air Force was proof that AW acted in accordance with those traits on any particular occasion. Instead, he argues that these traits are indicators of truthfulness, as such a person "even after being medically disqualified would not make false allegations of sexual assault to preserve a romantic relationship." While that may be true, we find Lt Col ON's descriptions of AW as "high performing," the Air Force being "the fabric of who she is," and giving "100 percent" after learning she was medically disqualified are not specific instances of conduct relating to truthfulness prohibited by Mil. R. Evid. 608(b).

Appellant's "bolstering" claim also fails. Before Lt Col ON testified, the Defense had attacked AW's credibility during its cross-examination of her. "Bolstering occurs before impeachment, that is, when the proponent seeks to enhance the credibility of the witness before the witness is attacked." *United States v. Toro*, 37 M.J. 313, 315 (C.M.A. 1993) (citations omitted). Thus, Lt Col ON's testimony could not improperly "bolster" AW's credibility, which already had been attacked.

### b. Human-Lie-Detector Testimony

Appellant specifies three instances of impermissible human-lie-detector testimony from Lt Col ON: (1) she did not ever think at any time that AW was accusing Appellant of sexual assault just so she could get out of trouble; (2) she stated AW had owned her mistakes, and was forthcoming and committed to integrity; and (3) she did not have any reason to doubt AW. We find these were not direct opinions by Lt Col ON about the truthfulness of AW's report of sexual assault. However, when we next consider whether they were the "functional equivalent" of human-lie-detector testimony, we find that (3) was.[24] After describing AW as a truthful person, Lt Col ON's declaration that she had no reason to doubt AW's allegation of sexual assault, was, in essence, testimony

---

[24] We consider instance (1) a lack of endorsement of a reason AW might by lying, and (2) Lt Col ON's opinion regarding character for responsibility and integrity. We find neither is testimony that Lt Col ON believed AW was telling the truth about the allegation of sexual assault.

that she believed AW's report of sexual assault. We find no prejudicial plain error.

It is error for a military judge to allow human-lie-detector testimony to be presented without interruption or an instruction to the members. And while the error was subtle,[25] we find it was plain or obvious error but did not materially prejudice a substantial right of Appellant. Lt Col ON was not a witness purporting to have specialized expertise or knowledge about whether someone is telling the truth. *See, e.g., United States v. Flesher*, 73 M.J. 303 (C.A.A.F. 2014) (finding error where the military judge allowed a witness to testify as an expert and whose testimony only served to repeat the victim's account); *United States v. Cauley*, 45 M.J. 353 (C.A.A.F. 1996) (finding no error where the military judge did not allow a detective to testify as an expert regarding false allegations when that testimony would only serve to attack the alleged victim's character for truthfulness). Upon cross-examination, defense counsel elicited one specific instance of AW's untruthfulness and attacked Lt Col ON's foundation for her opinion that AW told her the truth. We recognize that due to Lt Col ON's role as an ROTC detachment commander, her testimony might be given more weight, but find her testimony overall did not give the impression that she had a more-than-average ability to assess AW's truthfulness. Moreover, given the strong DNA evidence corroborating AW's account, AW's credibility was not a central issue. *Cf. Kasper*, 58 M.J. at 320 (finding prejudice where the impermissible evidence "d[id] not involve a stray remark on a secondary matter" but "involve[d] a central issue at trial.") Having reviewed the record as a whole, we do not find this error "had 'an unfair prejudicial impact' on the findings or sentence." *Schlamer*, 52 M.J. at 85–86 (quoting *United States v. Powell*, 49 M.J. 460, 463 (1998)).

**E. Trial Counsel Argument**

Appellant claims the circuit trial counsel made improper argument when she: (1) "vouched for [AW's] veracity when she stated 'then I know she is telling the truth' after rebutting a point from the defense cross-examination of [AW];" and (2) argued for spillover between the unrelated charged offenses.

---

[25] Defense counsel had objected to the question as "speculation," but did not object on the basis that it was the functional equivalent of human-lie-detector testimony, or ask for a curative instruction. These are some indications of the error's low prejudicial effect.

We reject the first claim, as the transcript on this point is in error. We have compared the transcript and the audio recording in the record of trial.[26] The circuit trial counsel did not say, "I know she is telling the truth," and instead said, "watch the OSI interview." The transcript should read:

> And so you have that. You have that prior consistent statement from her. Defense counsel wanted to pick on her, "now you never said that before, this is the first time we're hearing that." Well then watch the OSI interview because what you see, when she talked to OSI, she said exactly that.

We next consider Appellant's spillover claim, and find no error.

**1. Additional Background**

Appellant quotes three portions of the circuit trial counsel's closing argument to support his claim of improper argument. The first portion is the very beginning of the argument:[27]

> They trusted him because he wore this uniform. Everything that [AW] and [KA] had been taught by this very organization was they could trust their fellow [A]irmen, their fellow detachment members, their fellow pilots. You never leave another [A]irman behind. We're supposed to be wingman. We take care of each other, we taught them that, we told them that. And so when [AW] walks into the accused['s] apartment after that night at Westgate, she trusts that she is going to get home safely. When [KA] drinks more than she usually does that day on the river, she trusts that the accused is going to take care of her. And he betrayed that trust. When [AW] is in his apartment he sexually assaulted her mere feet away from where he had sexually assaulted [KA] four months earlier. [What the evidence has shown you in this case is that he is guilty].

Trial counsel laid out the structure of her argument about credibility:

---

[26] "The term 'record', when used in connection with the proceedings of a court-martial, means—(A) an official written transcript . . . or (B) an official audiotape . . . ." Article 1(14), UCMJ, 10 U.S.C. § 801(14); *see also* R.C.M. 1112(b) ("The record of trial contains the court-martial proceedings" and in a general court-martial shall include a "substantially verbatim recording of the court-martial proceedings.").

[27] The bracketed sentences are additional portions of the argument that Appellant did not quote.

> So the next question becomes how you can trust that evidence, how that evidence is credible, and how that shows you that beyond a reasonable doubt the accused is guilty. And you have three main areas that I want to talk about with that. With each of these cases. And the first thing that you have is a lack of motive on part of either of these women to come in here and tell you anything other than what is true and what happened and that's that they were sexually assaulted.

> The next part you have though is corroboration of what they have told you from other sources of evidence and from other statements that they have made outside of this courtroom that you have evidence of.

> And finally, you have the accused's own confession and the actions that he has taken to show his consciousness of guilt.

Trial counsel followed this structure, first arguing the offenses relating to AW before those relating to KA—the same order in which they presented their case. She ended with the following—the last two portions Appellant highlights in this appeal:

> The last piece I want to talk to you about briefly members is that you look at this and in order for this you have two women, two women who have never met, two women who didn't know each other, who have no connection to each other, who never even talked to each other. Four months apart saying they were sexually assaulted by the accused. And you see commonalities there. The trips to Hill, ["]come visit me at Hill,["] the petting of the hair, you see that. You see the lies that he tells. You see the manipulation, you see that. *He's either the unluckiest person in the world, or you have two women who are telling the truth.*

> And so when you look at all the evidence, when you look at these women, you know what you have in this case of two credible victims with evidence to back them up and an accused who has lied about this to multiple people because of his guilt. What you see is that they were there because they trusted him. They were there because we had told them to trust him. He was a fellow officer, a fellow pilot, a fellow ROTC member and then he betrayed that. [What the evidence has shown is that he sexually assaulted [AW] and that he sexually assaulted [KA]. And it's showing you that he's guilty. Thank you.]

(Emphasis added).

The military judge advised the court members both before and after findings argument that the arguments of counsel are not evidence. Additionally, before they began deliberations, the military judge provided the court members a standard "spillover" instruction, which included the following:

> An accused may be convicted based only on evidence before the court, and not on evidence of general criminal disposition. Each offense must stand on its own and you must keep the evidence of each offense separate. Stated differently, if you find or believe that the accused is guilty of one offense, you may not use that finding or belief as a basis for inferring, assuming, or proving that he committed any other offense.

> If evidence has been presented which is relevant to more than one offense, you may consider that evidence with respect to each offense to which it is relevant.

**2. Law**

We review prosecutorial misconduct and improper argument de novo. *See United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019), *cert. denied*, *Voorhees v. United States,* 140 U.S. 2566 (2020). When an appellant did not object at trial to trial counsel's argument, courts review for plain error. *Id.* (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)).

> Plain error occurs when (1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to a substantial right of the accused. Thus, we must determine: (1) whether trial counsel's arguments amounted to clear, obvious error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

*Id.* at 9 (internal quotation marks and citations omitted). The burden to establish plain error, including prejudice, is on the appellant. *Id.* at 9, 12.

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows, but may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *United States v. Gilley*, 56 M.J 113, 121 (C.A.A.F. 2001) (citations omitted). We do not "surgically carve out a portion of

the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omitted).

In *United States v. Burton*, 67 M.J. 150 (C.A.A.F. 2009), a case in which the appellant was charged with two sexual offenses occurring four years apart, the CAAF considered the trial counsel's findings argument inviting the court members to compare the charged offenses. After noting the military judge's spillover instruction, trial counsel told the court members that they "could not use guilt of one offense as proof of guilt of another offense." *Id.* at 152. Then the trial counsel in *Burton*

> told the panel it could "take these things and compare them for [appellant's] propensity to commit these types of offenses." He invited the panel to "take both of [the victims'] stories and lay them next to each other and compare them and see what this particular person's M.O. is."

*Id.* (second and third alterations in original). The CAAF held that "The Government may not introduce similarities between a charged offense and prior conduct, whether charged or uncharged, to show modus operandi or propensity without using a specific exception within our rules of evidence, such as [Mil. R. Evid.] 404 or 413." *Id.* (citation omitted). "It follows, therefore, that portions of a closing argument encouraging a panel to focus on such similarities to show modus operandi and propensity, when made outside the ambit of these exceptions, is not a 'reasonable inference[ ] fairly derived' from the evidence, and was improper argument." *Id.* at 153 (alteration in original) (quoting *Baer*, 53 M.J. at 237).

> The real risk presented by trial counsel's improper argument was that it would invite members to convict [the] appellant based on a criminal predisposition, not that members would now perceive properly admitted direct evidence of charged conduct as propensity evidence. This greater risk was properly addressed by the military judge's spillover instruction. The military judge having instructed the panel that counsel's arguments were not evidence and given a general spillover instruction, it was not plain and obvious that an additional instruction was wanted or needed.

*Id.* at 154 (citation omitted). "In the context of the entire trial," including the Government's presentation of evidence and argument, and the military judge's instructions, the CAAF did "not believe that any error in trial counsel's argument rose to the level of plain error that would require the military judge to *sua sponte* instruct on the proper use of propensity evidence or take other remedial measures." *Id.*

It is a permissible inference, referred to as the "doctrine of chances," to consider two otherwise independent events that, taken together, are unlikely to be coincidental. *See Estelle v. McGuire*, 502 U.S. 62, 69 (1991). That differs from the inference covered by the character evidence rule, which prohibits inferring a defendant's guilt based on an evil character trait. *See Michelson v. United States*, 335 U.S. 469, 475–76 (1948). The "doctrine [of chances] posits that 'it is unlikely that the defendant would be repeatedly innocently involved in the similar suspicious situations.'" *United States v. Matthews*, 53 M.J. 465, 470 (C.A.A.F. 2000) (quoting 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5:28 at 78 (1999)). The doctrine most often is employed to show the unlikelihood of accident. *See generally*, Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, The Doctrine of Chances*, 40 U. Rich. L. Rev. 419 (2006).

### 3. Analysis

Appellant states the circuit trial counsel's "arguments introduced similarities between the two unrelated charged sexual assaults by discussing them together and pointing out the 'commonalities' between the two alleged assaults." The result, he argues, is "the Government created a modus operandi of a sexual predator who relied on the trust of fellow [A]irmen to carry out his crimes in similar fashions" and "implied that [Appellant] possessed a propensity to commit sexual assaults." The Government counters that the arguments did not suggest a modus operandi or propensity, and the circuit trial counsel properly argued the "doctrine of chances."

We disagree with Appellant that circuit trial counsel argued modus operandi or propensity. We do not read her argument to suggest that Appellant has a signature method by which he commits sexual crimes, or that he is someone who is prone to commit sexual crimes. Instead, her argument suggested that the commonalities between the accusations of two unrelated women are factors the members should consider when weighing the credibility of the testimony of those victims.[28] The evidence she highlighted was not admitted for a limited purpose, so it was proper for her to argue therefrom reasonable inferences relating to witness credibility. Moreover, we also do not read her argument to imply that because Appellant was accused of more than one sexual offense, the allegations are more likely to be true. She did not invite the court

---

[28] We need not determine whether the "doctrine of chances" includes the unlikelihood that two witnesses were fabricating their accusations, as the Government argues on appeal.

members to consider improper "spillover" of evidence; the commonalities necessarily were relevant to offenses involving both women. We find no error, much less plain error.

**F. Ineffective Assistance of Counsel Allegations**

Through counsel, Appellant asserts his trial defense counsel provided ineffective assistance of counsel (issue (8)) for failing to object to incomplete instructions, improper character evidence, human-lie-detector testimony, and improper argument (issues (3), (5), (6), and (7), discussed *supra*, Sections C, D, and E).

Additionally, Appellant personally asserts that his trial defense counsel were ineffective for not filing a post-trial motion after the convening authority took no action on his sentence (issue 11). Appellant asserts the convening authority's failure to take specific action was plain error, and claims prejudice resulting from his trial defense counsel's "failure to request relief during clemency." We consider this issue in the next section, where we consider the convening authority's decision to take "no action" on Appellant's sentence.

**1. Additional Background**

On 23 December 2020, the Government moved this court to compel declarations or affidavits from Appellant's two trial defense counsel based on issue (8). The Government noted issues (5), (6), and (7), but omitted mention of issues (3) and (11). This court granted the Government's motion on 4 January 2021, which echoed the Government's request for declarations responsive to issues (5), (6), and (7). On 16 February 2021, this court granted the Government's motion to attach declarations from Appellant's trial defense counsel, Mr. DC and Capt AB. Mr. DC's declaration is responsive to issues (5), (6), and (7). Capt AB's declaration is responsive to issues (4), (5), and (6).

Regarding failing to object to improper character evidence (issue (5)), Mr. DC stated AW's credibility was "thoroughly attacked" and Capt AB stated AW's "credibility was attacked before and after the witness Lt Col O.N. took the stand." Further, Capt AB explained that

> [t]he Defense knew the specific instances brought up in our cross [examination] of A.W. were going to be specific instances that we went over with Lt Col O.N., negating the need to object to character evidence. Specifically, that she lied to stay in ROTC and that she lied about what she told Glendale Police Department.

Capt AB stated the Defense did object to human-lie-detector testimony (issue (6)), and the military judge overruled it. "An objection to human lie detector is encompassed within the speculation objection because it is effectively the same. An individual would be speculating as to whether they believe someone

is lying or not." Mr. DC essentially agreed. Regarding closing argument (issue (7)), Mr. DC stated "[a]ny improper argument was specifically addressed in the defense closing." Capt AB's declaration does not address issue (7), and instead explains why they did not object to trial counsel's argument that KA was unable to consent because of incapacitation by intoxication (issue (4)).

**2. Law**

The Sixth Amendment[29] guarantees an accused the right to effective assistance of counsel. *Gilley*, 56 M.J. at 124. We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id.* "Appellant's failure to show plain error is fatal to his ineffective assistance of counsel claims. . . . Appellant cannot demonstrate that his counsel's failure . . . was deficient when there is no plain or obvious error." *United States v. Schmidt*, __ M.J. __, No. 21-0004, 2022 CAAF LEXIS 139, at *37 n.2 (C.A.A.F. 11 Feb. 2022).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) if an appellant's allegations are true, is there a reasonable explanation for counsel's actions; (2) did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *See United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citations omitted); *Gooch*, 69 M.J. at 362. Considering the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome," instead it must be a "probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (citations omitted).

---

[29] U.S. CONST. amend. VI.

### 3. Analysis

We find no merit to Appellant's claims of ineffective assistance of counsel. First, as our analysis, *supra,* indicates, we found no error with respect to issues (3), (5), and (7). Moreover, we find trial defense counsel's explanations regarding issues (3) and (5) to be reasonable. We did not pierce waiver of issue (6) because we are confident Appellant was not prejudiced. Similarly, we see no reasonable probability that the result of Appellant's court-martial would be different had trial defense counsel objected to the military judge's instruction on intent for Specification 5. We find Appellant's trial defense counsel's performance pertaining to issues (3), (5), (6), and (7) did not fall below that expected of fallible lawyers, and Appellant received effective assistance of counsel.

## G. Convening Authority's Decision on Action

### 1. Additional Background

Appellant was convicted of offenses occurring before and after 1 January 2019. Appellant's court-martial adjourned after the sentence was announced on 12 December 2019. On 20 December 2019, Appellant's trial defense counsel submitted a waiver of clemency—on behalf of herself and Appellant—because the convening authority did not have the authority to "reduce, commute, or suspend [Appellant's] sentence as it relates to confinement and the Dismissal." While acknowledging that Appellant's sentence also included forfeiture of all pay and allowances, counsel did not request the convening authority provide relief on that portion of the sentence.

On 21 January 2020, the convening authority signed a Decision on Action memorandum. In that memorandum, the convening authority indicated he took "no action" on the findings or sentence. He also stated, "Prior to coming to this decision, I consulted with my Staff Judge Advocate" and noted Appellant did not submit matters under R.C.M. 1106. Also, neither victim submitted matters for the convening authority's consideration.

### 2. Law and Analysis

At the time the convening authority signed the Decision on Action memorandum in this case, Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, Section 13D (18 Jan. 2019), advised convening authorities to apply the version of Article 60, UCMJ, in effect at the time of the earliest offense.[30] At the same time, the instruction equated a convening authority's decision to take "no action" with granting no clemency relief, explaining:

---

[30] Specifically, AFI 51-201, ¶ 13.16, stated: "To determine the applicable version of Article 60, look at the date of the earliest offense resulting in a conviction. The version of Article 60 in effect on that date applies to the entire case."

> A decision to take action is tantamount to granting relief, whereas a decision to take no action is tantamount to granting no relief. Granting post-sentencing relief (i.e. "taking action") is a matter of command prerogative entirely within the discretion of the convening authority, as limited by the applicable version of Article 60, UCMJ.

AFI 51-201, ¶ 13.17.1.

During the pendency of this appeal, the CAAF decided *United States v. Brubaker-Escobar*, 81 M.J. 471 (C.A.A.F. 2021) (per curiam), holding:

> [I]n any court-martial where an accused is found guilty of at least one specification involving an offense that was committed before January 1, 2019, a convening authority errs if he fails to take one of the following post-trial actions: approve, disapprove, commute, or suspend the sentence of the court-martial in whole or in part.

*Id*. at 472.

In *Brubaker-Escobar*, the CAAF found the convening authority's failure to explicitly take one of those actions was a "procedural error." *Id*. at 472, 475. The court noted: "Pursuant to Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2018), procedural errors are 'test[ed] for material prejudice to a substantial right to determine whether relief is warranted.'" *Id*. at 475 (alteration in original) (quoting *United States v. Alexander,* 61 M.J. 266, 269 (C.A.A.F. 2005)). The court held the convening authority's error in taking "no action" was harmless because the appellant did not request clemency and the convening authority could not have granted meaningful clemency regarding any portion of the adjudged sentence. *Id*.

Appellant was convicted of offenses occurring before 1 January 2019; the convening authority made a procedural error when he took no action on the sentence. In testing for prejudice, we have examined the convening authority's decision on action and find Appellant suffered no material prejudice to a substantial right.

The convening authority was powerless to grant clemency on the adjudged findings, Article 60(c)(3)(A), UCMJ, 10 U.S.C. § 860(c)(3)(A); and, as to the sentence, could only disapprove, commute, or suspend, in whole or in part, the adjudged forfeitures of pay and allowances, Article 60(c)(4)(A), 10 U.S.C. § 860(c)(4)(A). However, Appellant did not wish to seek clemency relief for the forfeitures. Moreover, had the convening authority disapproved, commuted, or suspended the adjudged forfeitures, Appellant still would forfeit all his pay and allowances by operation of law. *See* Article 58b(a), UCMJ, 10 U.S.C. § 858b(a). Thus, the convening authority could not have provided Appellant meaningful

relief. We find Appellant was not prejudiced by the procedural error in the convening authority's decision.

Next we consider whether trial defense counsel's failure to file a post-trial motion to address this error in the convening authority's decision on action rises to ineffective assistance of counsel. We find that it does not.

In January 2020, when the convening authority took "no action" on Appellant's sentence, trial defense counsel would have been aware of the provisions of AFI 51-201, advising convening authorities to specify "no action" when they decide not to modify the adjudged sentence. Moreover, this court had not yet issued an opinion addressing whether following that guidance and specifying "no action" was error.[31] As the issue was new, we find Appellant's trial defense counsel's failure to file a post-trial motion based on the convening authority taking "no action" did not fall below the expected level of performance.[32] Finally, just as we found no prejudice to Appellant from the convening authority's failure to take action on his sentence, we find that even if trial defense counsel was ineffective, there is no reasonable probability that, absent the error, the result would have been different.

## H. Timeliness of Appellate Review

### 1. Law

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142. If there is a *Moreno*-based presumption of

---

[31] *See United States v. Finco*, No. ACM S32603, 2020 CCA LEXIS 246, at *15 (A.F. Ct. Crim. App. 27 Jul. 2020) (unpub. op), *pet. denied,* __M.J.__ No. 22-0082/AF, 2022 CAAF 168 (C.A.A.F. 3 Mar. 2022) (unpub. op.); *cf. United States v. Coffman*, 79 M.J. 820 (A. Ct. Crim. App. 2020) (sister-service Court of Criminal Appeals considered a similar issue in an opinion issued in May 2020). After *Finco*, we then issued numerous opinions with different analyses and resolutions of the issue. *See, e.g.*, *United States v. Aumont*, No. ACM 39673, 2020 CCA LEXIS 416 (A.F. Ct. Crim. App. 20 Nov. 2020) (unpub. op.). The CAAF issued its opinion clarifying the matter in September 2021. *Brubaker-Escobar*, 81 M.J. at 471.

[32] "Because law is not an exact science, an ordinary, reasonable lawyer may fail to recognize or to raise an issue, even when the issue is available, yet still provide constitutionally effective assistance." *Pelmer v. White*, 877 F.2d 1518, 1523 (11th Cir. 1989) (citation omitted).

unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39.

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(d), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

**2. Analysis**

Appellant's case was docketed with the court on 19 February 2020. The overall delay in failing to render this decision within 18 months of docketing is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine no violation of Appellant's right to due process and a speedy appellate review. The delay became facially unreasonable on 12 August 2021. The reasons for the delay include the time required for Appellant to file his brief, which he did on 18 December 2020—around ten months after docketing. Appellee submitted its answer on 18 February 2021, and Appellant replied to the answer on 19 March 2021.

Analyzing the *Barker* factors, we find the delay is long, though not excessively long. The length of the delay is partially owing to nine Defense-requested and one Government-requested (and unopposed) enlargement of time that the court granted before the case was joined. In Appellant's eighth request for enlargement of time, and pursuant to an order from this court to address the issue in any further requests, Appellant's counsel averred that "Appellant has been advised of his right to a speedy trial and this enlargement of time and

consents to this enlargement of time." Both parties requested to exceed the page limit for their briefs, which requests were granted. The record of trial comprises 11 volumes, including 1549 pages of trial transcript, 22 prosecution exhibits, 23 defense exhibits, and 64 appellate exhibits. Appellant raised 11 assignments of error, all of which this court carefully considered and resulted in this lengthy opinion.

Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it "adversely affects the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation. *See id*.

We determine Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant is not warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[33]

CADOTTE, Judge (dissenting in part and in the result):

I agree with my colleagues in the majority finding Specifications 4 and 5 of the Charge (sexual assault and abusive sexual contact of AW) are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).[1] However, for the reasons stated below, I depart from my colleagues

---

[33] The Statement of Trial Results failed to include the command that convened the court-martial as required by R.C.M. 1101(a)(3). Appellant has not claimed prejudice and we find none. *See United States v. Moody-Neukom*, No. ACM S32594, 2019 CCA LEXIS 521, at *2–3 (A.F. Ct. Crim. App. 16 Dec. 2019) (unpub. op.) (per curiam).

[1] All references to the UCMJ and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

and would set aside the findings for Specification 1 of the Charge (sexual assault of KA).

Unlike the majority, I find the military judge abused his discretion ruling that text messages from Appellant's cellular phone were admissible. I generally agree with my esteemed colleagues' findings as to assignment of error (2)—whether the search of his cell phone violated both the terms of the authorization and his Fourth Amendment[2] right—except as to the application of the exclusionary rule. Specifically, I come to a different conclusion as to whether Air Force Office of Special Investigations Special Agent (SA) LB's actions were "deliberate, reckless, or grossly negligent" or part of "recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). I further find that "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a)(3). Consequently, I would dismiss Specification 1 of the Charge with prejudice and set aside the sentence, and remand for a sentencing rehearing.

The Fourth Amendment "protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Herring,* 555 *U.S.* at 139 (citation omitted). The exclusionary rule doctrine was created by the United States Supreme Court to deter future Fourth Amendment violations. *Davis v. United States*, 564 U.S. 229, 235–36 (2011). "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* at 236. The Supreme Court applied greater limitation to the application of the exclusionary rule in *Herring*, holding:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

555 U.S. at 144.

Fundamental to this issue is determining when the conduct of law enforcement is sufficiently negligent to trigger the exclusionary rule. As the majority points out, "gross negligence" has "been defined in myriad ways," however *Herring* did not define the term. Since "gross negligence" has been left undefined in the exclusionary rule environment, the facts of the *Herring* and *Davis* cases

---

[2] U.S. CONST. amend. IV.

provide context to law enforcement conduct which the Supreme Court found did not rise to a level of culpability exceeding mere negligence.

In *Herring*, the petitioner was arrested by law enforcement officers based upon a warrant listed in a neighboring county's computer database. *Id.* at 137. The petitioner was searched incident to his arrest, and drugs and a gun were found. Afterwards, it was discovered that the warrant on which the arrest was based had been recalled months earlier and that it was mistakenly still in the computer database. *Id.* at 138. The petitioner moved to suppress the evidence seized during his initial illegal arrest. However, the petitioner's motion was denied because "there was no reason to believe that application of the exclusionary rule here would deter the occurrence of any future mistakes." *Id.* Ultimately, the Supreme Court held that the exclusionary rule should not be applied concluding "[t]he fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Id.* at 140.

Then, in *Davis*, the question before the Supreme Court was "whether to apply [the exclusionary rule] when the police conduct a search in compliance with binding precedent that is later overruled." *Davis*, 564 U.S. at 232. The court concluded "[r]esponsible law-enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." *Id.* at 241 (citation omitted). The Supreme Court held "that when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Id.* at 249–50.

In this case, an investigation into Appellant began on 26 January 2019 based on a report of sexual assault by AW which occurred earlier the same day. At the time, law enforcement was unaware of any allegations of criminal conduct committed by Appellant with regard to KA. To investigate AW's sexual assault report, SA LB drafted the required Air Force form for an authority to search and seize Appellant's cellular phone, attaching to it her probable cause affidavit. SA LB presented both documents to the group commander with search authority, and he subsequently granted the authorization to search and seize. The affidavit included information only with regard to text messages exchanged close in time to the assault relating to AW.

During the motion hearing, SA LB testified she wanted authorization to search Appellant's phone for "communications between [Appellant] and [AW] and between [Appellant] and [TD] . . . and ensure that [the messages] were actually from [Appellant's] phone." However, when SA LB actually searched the phone she exceeded the scope of the evidence for which she testified she wanted to obtain search authority—communications between Appellant, AW, and TD. During her search of Appellant's phone, SA LB viewed text messages

on Appellant's cellular phone that predated by months the offenses committed upon AW, and that were not communications between AW, TD, and Appellant. Applying a modicum of common sense, it should have been clear to SA LB the evidence she was purported to be searching for would not be located in text message communications that took place months before the date of the offense. If SA LB had acted as a reasonable law enforcement official, she would have confined her search to the communications she was "ensur[ing] . . . were actually from [Appellant's] phone."

When SA LB continued her search beyond her stated purpose she discovered text messages that led to the allegation of Appellant's sexual assault of KA. The text messages, and derivative evidence, were critical at trial with respect to Specification 1 of the Charge. When testifying, KA was unable to say her vulva was penetrated by Appellant's penis. Rather, KA's testimony consisted of feeling "[p]ressure from behind" located on her vagina. Only when considering the unlawfully obtained text messages is there legally sufficient evidence beyond a reasonable doubt as to penile penetration. *See United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (applying the test for legal sufficiency that after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt).

In his ruling denying the motion to suppress, the military judge concluded SA LB did not violate Appellant's Fourth Amendment rights. Then the military judge assumed, arguendo, if SA LB violated Appellant's Fourth Amendment rights, SA LB "did not do so deliberately, recklessly, or with gross negligence." In his ruling, the military judge also found the case did not "involve any recurring or systemic negligence on the part of law enforcement." The military judge concluded that SA LB "acted reasonably – especially considering the nature of digital evidence and the realties [sic] faced when attempting to search and analyze the same without knowing potentially involved parties' phone numbers." Finally, the military judge determined that "[t]here is little public good to be had in excluding evidence that was obtained from what must surely be a mistake, if even a mistake was made."

I find that the military judge abused his discretion in that he improperly applied the law. *United States v. Lutcza*, 76 M.J. 698, 701 (A.F. Ct. Crim. App. 2017) (citing *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (additional citation omitted)). SA LB in no way acted "reasonably" and her culpability is at least grossly negligent. This court established that "[p]ractitioners must generate specific warrants and search processes necessary to comply with that specificity . . . ." *United States v. Osorio*, 66 M.J. 632, 637 (A.F. Ct. Crim. App. 2008). SA LB did not conduct a search with specificity; rather, with the exception of communications between Appellant and his counsel, SA LB was

unrestrained in the messages she viewed. SA LB testified that "every other [not ADC] conversation that was there did not appear to be privileged communication and then [she] just took a good look through the messages for other witnesses in the case, and for victim – messages with the victim, and messages with [TD] specifically." SA LB is accountable for her ignorance of the law that was in existence at the time of her search and she was, at a minimum, grossly negligent.

I find the facts of the case before the court are unlike *Herring* or *Davis*. SA LB's failure to understand the limitations of the Fourth Amendment is in contrast to law enforcement personnel relying upon an erroneous warrant database entry as in *Herring*, or following then-existing precedent that was subsequently overruled as in *Davis*. Here, SA LB executed a search authorization, which she drafted, that was facially deficient in limiting the scope of the search to such a degree that an investigator could not reasonably have presumed the search authorization to be valid. SA LB failed to recognize the search authorization was facially deficient, which supports SA LB was not acting as a reasonable law enforcement officer should. A reasonable law enforcement officer would have understood that searching through text messages that predate the offense under investigation exceeded the scope of a lawful search.

Further, it appears SA LB's conduct was not an isolated incident. During cross examination, SA LB agreed with the proposition that within the last two years prior to her testimony it was her standard practice for phone searches "[t]hat when there's probable cause for anything on the phone, you can search everything on the phone." SA LB explained further that "[i]f the warrant allows for the entire phone to be seized, then all the data on the phone becomes property of the [G]overnment and can be searched at any time." SA testified as to her expansive view with regard to the scope of a search:

> Because the original authority gave us authority to search the entirety of the phone that includes his [sic] contents at the time of seizure. So anything that's in the phone belongs to the [G]overnment from the time of seizure. So anything regarding any allegation, or any other evidence of crimes is – if we have – we were taught, you know, in FLETC[3 . . . if] I have a right to be in the phone, and I see something that leads me to believe there's evidence of a crime, just like we did with finding the other

---

[3] I understand FLETC to stand for Federal Law Enforcement Training Center.

allegation of a sexual assault, that's in play. So there was no
need to get an expanded scope.

SA LB's expressed past practice with regard to her unrestrained view as to the scope of search authorizations is clear indicia of an apparent pattern of negligence with regard to the Fourth Amendment. In applying the Fourth Amendment to electronic devices, the United States Court of Appeals for the Armed Forces explained that "searches are expansive enough to allow investigators access to places where incriminating materials may be hidden, yet not so broad that they become the sort of free-for-all general searches the Fourth Amendment was designed to prevent." *United States v. Richards*, 76 M.J. 365, 370 (C.A.A.F. 2017). SA LB's actions with regard to the search of Appellant's cellular phone were consistent with her misunderstanding that she was permitted to conduct broad "free-for-all general searches." *Id.* Contrary to the finding of the military judge, which I find is a misapplication of *Herring*, I find SA LB's standard practice for phone searches was recurring negligence. *Herring*, 555 U.S. at 144.

I also do not agree with my colleagues' finding that "exclusion of the evidence seized because of [SA LB's] unlawful search is far too drastic a response to make her aware of her mistaken ideas and help ensure her conduct is not repeated." It is essential for law enforcement officials understand and apply the limitations of the Fourth Amendment. SA LB did not. Unlike in *Davis*, SA LB did not act "with an objectively 'reasonable good-faith belief' that [her] conduct [was] lawful." *Davis*, 564 U.S. at 238 (citations omitted). A "reasonable good-faith belief" must include conscientiously limiting the scope of a search to the criminal offense under investigation. SA LB operated for two years under the belief that once a cellular phone was seized, it was the property of the Government, and could be searched in its entirety untethered to the specific criminal allegation under investigation. It is essential that when law enforcement conduct a search of electronic media, which can store almost limitless personal information, that it is done within the bounds of the Fourth Amendment. Considering SA LB's claim she was acting consistent with her FLETC training, failing to exclude the fruits of her unlawful search incentivizes future constitutional violations; therefore, exclusion is necessary as deterrence and to drive change in law enforcement training and practice. I recognize the costs to the justice system by dismissing the specification. However, I find that exclusion of the evidence here will result in appreciable deterrence of future unlawful searches and outweigh those costs. Mil. R. Evid. 311(a)(3). I note Appellant's convictions for crimes against AW would not be disturbed by exclusion of the evidence, and he may be sentenced for those crimes. As a result, I do not agree with the majority opinion's consideration of Appellant's convictions for which AW was the victim when weighing societal costs. While I find that after considering the factors set forth in *United States v. Ceccolini*, 435 U.S. 268, 278

(1978), the totality of the factors weigh against exclusion of KA's testimony; unlike my colleagues, I find the military judge erred by failing to suppress the text messages as well as the derivative evidence pertaining to KA. Consequently, I would set aside the finding of guilty, with prejudice, with regard to Specification 1 of the Charge.


FOR THE COURT

CAROL K. JOYCE
Clerk of the Court